ELECTRICAL EQUIPMENT COMPANY et al., Plaintiffs,

v.

SECURITY NATIONAL BANK et al., Defendants.

Civ. A. No. 2–73.

United States District Court,
District of Columbia,
Civil Division.

Jan. 15, 1976.

Ralph N. Albright, Jr., Washington, D. C., for Electrical Equipment Co.

Robert J. Elliott, Washington, D. C., for Security Nat. Bank and Royal Nat. Bank of New York.

Alan Y. Cole and Isaac N. Groner, Washington, D. C., for Nat. Realty & Const. Co., Inc., Nat. Center Corp., and Atlantic Mechanical Contractors, Inc.

John H. Frohlicher, Richard S. Arfa, Washington, D. C., Herbert E. Milstein, Washington, D. C., for Alexander Title Agency, Inc., Columbia Plaza Corp. and John McShain, Inc.

John H. Frohlicher, Washington, D. C., for John P. Cooney and John W. Underwood.

Alan Y. Cole, Isaac N. Groner, Washington, D. C., for Louis J. Pomponio, Jr., Mary Lou Pomponio, Peter Pomponio, Carolyn Pomponio, Paul Pomponio, Judith B. Pomponio, and Arlington Woodworking & Lumber Co., Inc.

Harold P. Ganss, Washington, D. C., for Baltimore Concrete Block Corp.

J. Gordon Forester, Jr., Walter J. Smith, Jr., Peter A. Greenburg, Washington, D. C., for Cummins-Wagner Co., Inc., Donn Products, Inc. and General Dynamics Corp.

Daniel V. S. McEvily, Washington, D. C., for ITT Grinnell Corp.

Irwin H. Liptz, Washington, D. C., for Artistica, Inc. IGM Tile Division.

Ern Reynolds, Falls Church, Va., for Insulation Contractors, Inc.

Richard J. Byrd, Fairfax, Va., for Jacron Sales Co., Inc.

Jean J. Provst, Jr., Washington, D. C., for Johnson Service Co.

Wallace Luchs, Jr., Washington, D. C., for Maryland Lumber Co. and Maryland Steel Erectors, Inc.

Saul M. Schwartzbach, Washington, D. C., for Maurice Electrical Supply Co. Inc.

Warren K. Kaplan, Joseph V. Gartlan, Jr., Dorothy D. Sellers, Washington, D. C., for Murick Supply Co., Inc.

Melrod, Redman & Gartlan, Dorothy D. Sellers, Washington, D. C., for Owen Steel Co. of North Carolina, Inc.

Ivan J. Shefferman, Chevy Chase, Md., for FH Sparks Co. of Maryland, Inc.

John F. Myers, Washington, D. C., for Tidewater Equipment Co.

James R. O'Connell, Washington, D. C., for U. S. Local No. 5 Pension Fund, U. S. Local No. 5 Vacation Fund and U. S. Local No. 5 Apprenticeship.

MEMORANDUM OPINION

PRATT, District Judge.

On September 22, 1975, this Court granted the motions for summary judgment of plaintiff (No. 1) Electrical Equipment Company and plaintiff (No. 6) ITT–Grinnell Corporation against defendants (Nos. 7 and 8) Columbia Plaza Corporation and John McShain, Inc., and entered judgment thereon. On January 14, 1976, the Court granted similar motions for summary judgment against said defendants filed jointly on behalf of the remaining plaintiffs, i. e.,

(No. 3) Baltimore Concrete Block Corporation

(No. 4) Cummins-Wagner Corporation

(No. 7) IGM Division of Artistica, Inc.

(No. 8) Insulation Contractors, Inc.

(No. 9) Jacron Sales Company

(No. 10) Johnson Service Company

(No. 15) Tidewater Equipment Co., Inc.

(No. 16) Local No. 5 Pension, Vacation and Apprenticeship Funds

and granted a similar motion on behalf of plaintiff (No. 14) F. H. Sparks Company of Maryland against defendant (No. 7) Columbia Plaza Corporation alone. The grounds of said motions are that defendant John McShain, Inc., through the corporate shell of Columbia Plaza Corporation, entered into a joint venture with the Pomponio organization through the corporate shell of National Center Corporation for the construction of the Columbia Plaza Office Building as a result of which John McShain, Inc. is liable on contracts of the National Realty & Construction Co., Inc., a Pomponio company, and of Atlantic Mechanical Contractors, Inc., another Pomponio company, reasonably necessary in the construction of the Columbia Plaza Office Building. As an alternative ground, plaintiffs assert that they may recover against defendant John McShain, Inc., the owner of the non-FHA portion of the project, for the reason that plaintiffs are third party beneficiaries of a covenant remaining with the land, requiring any subsequent grantee to pay materialmen for materials supplied to the project.

In granting summary judgment to plaintiffs, we hold that under the peculiar factual context of this case there was a joint venture between the Pomponio organization, including National Realty & Construction Co., Inc., National Center Corporation, and Atlantic Mechanical Contractors, Inc., on the one hand, and defendants John McShain, Inc., and Columbia Plaza Corporation, a McShain company, on the other hand, sufficient to render defendant John McShain, Inc. and Columbia Plaza Corporation liable on contracts entered into by National Realty & Construction Co., Inc. and any other Pomponio organization with the various plaintiff materialmen.

The purpose of this Memorandum is to spell out the basis for this holding.

## The Facts

It is not necessary to set forth all of the facts accruing over more than a decade, and only the more essential events are set forth herein. In 1960, defendant Columbia Plaza Corporation (Columbia Plaza) was formed and in 1964 said defendant entered into a lease with option to purchase with the Redevelopment Land Agency (RLA) which provided that Columbia Plaza would erect an apartment on what is described as the FHA portion of the demised premises and a hotel on the non-FHA portion. The hotel requirement was later amended to provide for the construction of an office building instead. At this time, defendant John McShain, Inc. owned 27% of the stock of Columbia Plaza. John McShain, Inc. was a Delaware corporation whose only stockholders were John McShain and his wife.

John McShain, Inc. began construction of the apartment complex. Prior to its completion, Columbia Plaza exercised its option to purchase and in 1966 RLA conveyed the property in fee simple, subject to certain conditions, to Columbia Plaza. After completion, Columbia Plaza sold the apartment complex for approximately $28 million. After this sale, John McShain, Inc. or John McShain, pursuant to prior agreement, acquired all of the remaining stock of Columbia Plaza.

Columbia Plaza was still obligated to complete the erection of the hotel (later changed to the office building) on the non-FHA portion of the property. Excavation on this portion was commenced by John McShain, Inc. in 1968. Sub soil problems developed, excavation was discontinued, and after negotiation, RLA was persuaded by McShain in August, 1970, to amend the 1966 deed to permit the erection of an office building in place of the hotel. In December, 1968, John McShain, Inc. had retained an architect to prepare drawings for the proposed office building.

By 1970, the McShain organization was heavily committed to other construction projects such as the John F. Kennedy Center for the Performing Arts and was reluctant to devote its remaining resources to the construction of the office building. It was also given an ultimatum by RLA to either commence construction of the office building or RLA would exercise its rights to reenter and take back the land on ground of default.

At all times relevant herein, Columbia Plaza was the wholly owned creature of John McShain, Inc. and John McShain. In addition, one Paul S. Fry, Treasurer of John McShain, Inc., was President of Columbia Plaza, having been installed therein to protect and look after the interests of John McShain and John McShain, Inc. in Columbia Plaza. To this end, Fry in 1964, 1970 and 1972, was given general powers of attorney by John McShain.

At all times relevant herein, Louis J. Pomponio, Jr. and his brothers were "principals" of the Pomponio corporate interests, which consisted of some forty-eight construction related corporations, all being located at 1925 North Lynn Street, Arlington, Virginia. One of these corporations was National Center Corporation (National Center) of which Louis J. Pomponio, Jr. was President and his brothers, Peter and Paul, were Vice-President and Treasurer, respectively. National Center, all of whose stock was owned by the three brothers, had no other employees. Another Pomponio corporation was the National Realty & Construction Company (National Realty) which was to assume the duties of general contractor on the Columbia Plaza office building construction. Atlantic Mechanical Contractors, Inc. was another Pomponio corporation, doing only Pomponio business, having an office at the same Lynn Street, Arlington, Virginia address and ceasing business in October, 1972, when the Pomponio empire "folded."

It is in the light of this complex corporate background that the coming together of the McShain and Pomponio interests took place. In the summer of 1970, after receipt of the RLA demand, Paul S. Fry was approached by Louis J. Pomponio, Jr. and Charles J. Piluso, attorney for the Pomponio corporate empire. The latter expressed an interest in expanding the Pomponio construction and management activities in the District of Columbia and particularly referred to the possible purchase of Columbia Plaza. After various proposals, the Pomponios suggested that they construct the office building in the name of Columbia Plaza and that upon completion of the office building and approval by RLA, Columbia Plaza would convey title to the office building to the Pomponios for $5 million. The correspondence, beginning in May, 1970, relating to these negotiations was directed to John McShain, Inc.

Fry, who was reporting regularly to John McShain in Ireland, conveyed this proposal to John McShain who approved it and authorized Fry to enter into a contract with the Pomponios. As of November 17, 1970, Fry in the name of Columbia Plaza entered into a written agreement with National Center Corporation, represented by Louis J. Pomponio, Jr., its President. This agreement, while in the format of a sales contract with closing time unspecified and undetermined, in essence provided that the Pomponio organization would erect the office building on the property for $13 million free and clear of all liens for work, labor and material, and that upon completion of the office building by the Pomponios and RLA certification, John McShain, Inc., through Columbia Plaza, would convey title to the office building to the Pomponios for the price of $5 million and assumption by the purchaser of payment of construction loans made by Royal National Bank of New York (Royal Bank) to Columbia Plaza in the amount of $13 million.

Prior thereto, in August, 1970, John McShain, Inc. had paid $226,000 to RLA to cover the increase in land value resulting from the change to an office building in place of a hotel.

On September 30, 1970, Louis J. Pomponio, Jr. had been appointed Vice President and elected Director of Columbia Plaza and Charles J. Piluso Secretary-Treasurer. Prior to this date, Columbia Plaza had authorized Mr. Pomponio to sign checks on Columbia Plaza's checking account with the Royal Bank. Construction loans totalling $13 million were obtained with the assistance of the Pomponios at the Royal Bank. To obtain such loans, John McShain, Inc. had to deposit approximately $1.7 million as "front money" into the Columbia Plaza account. In August and November, 1970, John McShain, Inc. guaranteed payment on these construction loans.

Construction was commenced in early 1971, not by National Center Corporation which was a party to the agreement made as of November 17, 1970 with Columbia Plaza, but by another Pomponio corporation, i. e., the National Realty & Construction Corporation. At all times relevant herein, Louis J. Pomponio, Jr. was Executive Vice-President of National Realty, and his brother Peter was the sole stockholder. Loan advances from Royal Bank were directly requisitioned by National Realty. Paul S. Fry never saw or signed any of said requisitions and never signed any Columbia Plaza checks relating to construction of the office building. All the books and records of Columbia Plaza relating to this construction were maintained at the Pomponio corporate offices in Arlington, Virginia.

Construction continued until sometime during the summer of 1972. During this period, John McShain, Inc., in the spring of 1972 advanced $2 million to the Pomponios for operating expenses and in August, 1972 another $597,000 for direct payment to materialmen and suppliers. In September and October, 1972, another $61,000 was advanced to the project. By the summer of 1972, the entire construction loan had been exhausted by National Realty, although the office building was only 50 to 60% complete. During this crisis, the Pomponios approached the Security National Bank (successor to Royal Bank) and asked that the loan be increased from $13 million to $17.5 million. McShain, being advised by Paul S. Fry as to these developments, refused to make any further guarantee, thereby precipitating foreclosure proceedings by the lending bank. At the trustees' sale on November 21, 1972, John McShain, Inc. purchased the property from the trustees for $13.65 million. Thereafter, John McShain, Inc. completed construction of the office building.

During the year 1972 and prior to the foreclosure on November 21, 1972, the plaintiffs supplied materials and services used in the construction of the office building and pursuant to orders of National Realty, and in some instances of Atlantic Mechanical Contractors, Inc., all of which are verified by affidavits and invoices which are part of the record. Plaintiffs have not been paid for said materials and services.

### The Applicable Law

A joint venture has been defined as—

"An association of persons, by way of contract express or implied, to engage in and carry out a single business venture for joint profit, for which purpose they combine their efforts, property, money, skill and knowledge, without creating a partnership or a corporation, pursuant to an agreement that there shall be a community of interest among them as to the purpose of the undertaking, and that each joint venturer shall stand in the relation of principal, as well as agent, as to each of the other coventure[r]s, with an equal right of control of the means employed to carry out the common purpose of the venture." (46 Am. Jr.2d, *Joint Ventures* § 1, pp. 21–22). Despite the general acceptance of the above criteria, courts have not laid down a precise definition of what constitutes a joint venture, nor have they fixed definite parameters, but instead have decided such question on the facts of the particular case. See 46 Am.Jur.2d, *supra,* § 1, pp. 21–22.

In the District of Columbia, the cases which are not numerous and no two of which are precisely alike, follow the general rule that,

"Two or more persons who join in a particular business enterprise for profit, as in the purchase development and sale of real estate, create a joint adventure or venture * * * This relationship may fall short of being a partnership or an agency. *The relationship may be inferred from the conduct of the parties without express agreement.*" (Emphasis supplied) *Libby v. L. J. Corp.*, 101 U.S.App.D.C. 87 at 90, 247 F.2d 78 at 81 (1957).

See also *Hight v. Richmond Park Improvement Co.*, 47 App.D.C. 518 (1918); *Davidson v. E. F. Brooks Co.*, 46 App. D.C. 457 (1917), and *Coles v. Redskin Realty Co.*, 184 A.2d 923 (D.C.Mun.App. 1962).

Although defendants assert that the agreement made as of November 17, 1970 was a sales agreement, which it was despite the unspecified closing time, it was also something more. It was at the very least an agreement creating a joint venture for the construction of an office building which, when and if completed, would be sold to one of the joint venturers. Not only the language of the agreement itself but also the conduct of the parties both before and after November 17, 1970 strongly indicate this. We know of no reason or cited authority why a joint venture for the purposes of construction is to be negatived or ruled out because the building, when completed, is to be purchased by one of the parties. Certainly, the pattern of conduct which was followed throughout by the McShain and Pomponio interests indicates a merger of the established business reputation and financial assets of one party with the construction capabilities of the other for the purpose of completing the construction of the office building. Under the uncontested facts of this case, and in the light of the motivations of the respective parties, we have no difficulty in finding that the agreement dated November 17, 1970 and the actions taken prior and pursuant thereto constituted a joint venture between the McShain interest on the one hand and the Pomponio organization on the other. Such being the case, each party is the principal and agent of the other for actions taken in the course of the joint venture. John McShain, Inc. and the Pomponio organization are liable on contracts entered into by each other reasonably necessary in the construction of the office building.

The actual agreement, of course, was entered into by Columbia Plaza and National Center, and the contractors who dealt with plaintiffs were National Realty or Atlantic. As is clear from the facts, Columbia Plaza was only a corporate shell created and dominated by John McShain, Inc. and John McShain. Similarly, National Center, also a corporate shell, National Realty, and Atlantic were corporations created and/or controlled by the Pomponio organization. While it is true that the corporate device normally limits the liability of stockholders to the amount of their actual investment in the corporation, there are exceptions to this general rule where a court in the exercise of its equity powers may disregard the corporate fiction and pierce the corporate veil. The exercise of such powers in this case is particularly necessary and compelling to avoid an unjust result and to prevent manifest injustice. Accordingly, we hold that the corporate shell of Columbia Plaza shall be disregarded in order to permit recovery against John McShain, Inc. Our holding would be the same if the purchase at the foreclosure was by a third party. It is strengthened by the fact that John McShain, Inc., and not some third party, was the purchaser at the November, 1972 sale, thereby cutting off any statutory liens which may have attached to the property in favor of the various plaintiffs. As a result of such purchase, John McShain, Inc. has had the benefit of the property and services of plaintiffs which were supplied pursuant to the McShain-Pomponio joint venture, and John McShain, Inc. has not paid for

such property and services. It would be travesty if John McShain, Inc. could escape liability by hiding behind the facade of Columbia Plaza, its wholly owned subsidiary, which was never more than its corporate shell. This is a classic case for disregarding the corporate fiction and assessing liability not only against Columbia Plaza, the nominal party to the joint venture, but also against John McShain, Inc., the real party in interest.

In reaching this conclusion, we express no opinion concerning plaintiffs' alternative ground of recovery against John McShain, Inc., as third party beneficiaries of the covenant with RLA requiring any subsequent grantee to pay claims of materialmen.